622 So.2d 1239 (1993)
Robert J. MUHAMMAD
v.
Debra MUHAMMAD.
No. 92-CA-470.
Supreme Court of Mississippi.
August 5, 1993.
*1240 Ahmad Muhammad, Lorman, Kennie E. Middleton, Fayette, for appellant.
No Brief for appellee.
Before HAWKINS, C.J., and PITTMAN and BANKS, JJ.
BANKS, Justice, for the Court:
This case presents the always sensitive and problematic issue of child custody between competing parents in a setting colored by the equally sensitive subject of religious beliefs and values. We are asked to determine whether the trial judge's assessment of the issue of custody was impermissibly tainted by his view of the validity of appellant's religious beliefs. We are asked also to find manifest error as to the grant of divorce.

I
On December 7, 1989, Robert J. Muhammad initiated proceedings in the Jefferson County Chancery Court by filing a complaint against his wife Debra Muhammad for custody of the couple's two children, Radeyah P. Muhammad and Raheem K. Muhammad. Mrs. Muhammad had removed the children from the couple's marital domicile in French Lick, Mississippi, to Flint, Michigan, on October 13, 1989. At the time Mr. Muhammad filed his complaint, Radeyah was two years old and Raheem was one. Prior to October 1989, Radeyah had resided in Mississippi continuously since she was two months old, and Raheem had lived his entire life in Mississippi.
Mrs. Muhammad responded to Mr. Muhammad's complaint by contesting his efforts to get custody, and by filing a cross-complaint for divorce on the ground of habitual cruel and inhuman treatment. Mr. Muhammad subsequently filed his own cross-complaint for divorce. He claimed that Mrs. Muhammad had deserted him when she departed with the couple's children on October 13, 1989.
Hearings were held in this matter on April 2, 1991, and October 30, 1991, because of a discovery issue regarding assets and income that remained unresolved at the time of the first hearing. At the conclusion of the April hearing, the court announced that it would grant Mrs. Muhammad a divorce because she was the only *1241 one who put on evidence in that regard. Mr. Muhammad, through counsel, stated that he had no objection. Nevertheless, at the October hearing, Mr. Muhammad, through new counsel, contested the issue anew. On December 5, 1991, the Jefferson County Chancery Court rendered a decision granting Mrs. Muhammad custody of the children and a divorce on the ground of habitual cruel and inhuman treatment. Mr. Muhammad was granted reasonable visitation rights and ordered to pay child support in the amount of $200.00 per month. Mr. Muhammad subsequently filed a motion for new trial, which was heard on February 11, 1992. The motion was formally denied on May 4, 1992, and Mr. Muhammad filed notice of appeal to this Court two days later.

II
Robert J. Muhammad and Debra Muhammad, formerly Robert and Debra Wilson, were married on September 17, 1983, in Flint, Michigan. They resided in Flint until 1987, when they relocated to an Islamic community in French Lick, Jefferson County, Mississippi, known as the University of Islam. The couple had become acquainted with the spiritual leader of the community, Mr. Marvin Muhammad, through teaching sessions that Mr. Muhammad conducted in Flint. Robert and Debra visited the University of Islam twice in early 1987. The first time, they stayed at Marvin Muhammad's house, and the second time, they stayed in a hotel in Natchez.
In July 1987, Debra Muhammad and the couple's two month old child, Radeyah, relocated to the University. With the agreement of Debra, Robert remained in Flint for a few more months before permanently relocating to the University himself in October of 1987. Robert sold the couple's house to Debra's father and sold and disposed of some personal property, including a car. A substantial portion of the proceeds was given to the New Nation of Islam.
A second child, Raheem, was born to Robert and Debra Muhammad on August 4, 1988. Robert and Debra lived together with their two children at the University of Islam until October 13, 1989. While Robert was asleep during the late night hours of that date, Debra took the two children and went back to Flint, Michigan. She and the children were transported by Debra's mother, who had come down from Flint, Michigan, to take them back after Debra had communicated to her by phone that Debra was extremely unhappy with life at the University. Robert still resides at the University.
Robert and Debra had been experiencing marital difficulties before moving to the University. Debra indicated to at least one person at the University that she had tried Islam and moved to the University with Robert in an effort to save her marriage. Debra testified that she had been unhappy in the lifestyle at the University from the moment she arrived there.
The University of Islam is comprised of members of the New Nation of Islam. Members of the New Nation of Islam practice the "Black Muslim" religion. The New Nation and University of Islam are under the leadership of Mr. Marvin Muhammad. To his followers, Marvin Muhammad is known as the "Son of Man." According to Marvin Muhammad, he is to his followers as Jesus Christ is to Christians; he is accepted as their savior in the sense that he provides them with the spiritual guidance necessary to attaining salvation. The chief earthly mission of the New Nation is to unite peoples of the African diaspora and establish a nation outside the United States that they themselves would govern.
Marvin Muhammad and approximately twenty of his followers dwell, work, and practice their religion at the University of Islam. The University operates a bakery, auto repair business, and tailor shop. All funds that are generated from these operations are placed into a common fund under the control of Marvin Muhammad. Any decision to spend money for any purpose is made by Marvin Muhammad. Robert Muhammad has worked as an auto mechanic since arriving at the University. Debra Muhammad worked in the bakery and *1242 eventually moved to the position of teacher's assistant at the University's school.
The school, which is unaccredited, educates all of the children who reside in the community. There were approximately ten or eleven children residing there when Debra Muhammad and her two children lived there. The ages of the children at the school ranged from two to fifteen at that time. All instruction was given by a single teacher with the aid of one assistant.
Virtually every aspect of life of the University is impacted by religious doctrine. The social and family structure is strongly paternal. Men are viewed as the maintainers of their wives and children. Women are required to submit to their husbands. The role of the woman is viewed primarily as being the helpmate of her husband. Child care is one of her chief responsibilities. Women make no decisions. They cannot leave the confines of the community without the permission of their husband. Members of the faith are not allowed to ingest alcohol, tobacco, drugs or other intoxicating substances. Neither are they allowed to eat red meat. Although the food supply is adequate in quantity, the diet at the University is fairly limited to beans, broccoli, fish, bread, cauliflower, and sometimes corn. Meals are restricted to one per day for adults. Fasting from these meals periodically occurs. Women are required to breastfeed their children. At least some of the milk and juices received by women through the Women, Infants and Children (WIC) program go to the operation of a bakery. Mail is subject to being censored.
When Debra Muhammad resided at the University, the twenty or so followers of Marvin Muhammad lived in two houses of two to three bedrooms each. Each family occupied one room in the dwellings. There was one bathroom in the house in which Robert and Debra lived. Each family was allotted daily time segments for bathroom privileges. Only Mr. Muhammad's house was equipped with a refrigerator and stove. There was conflicting testimony whether Robert had a small refrigerator.
In Flint, Debra and the children reside in the house sold by Robert to her father. It is described as a three-bedroom house in a nice neighborhood with ample room for the children. She receives welfare assistance under the Aid to Dependent Children program. In Flint she enjoys familial support from her parents, with whom she lives, and her godmother. Debra was unemployed at the time of the trial but was attending school. She testified that she had made the dean's list the preceding semester and that she aspired to a bachelor's degree in accounting. Debra estimated that in all she had completed two years of college. In her opinion, the education available to her children at the University of Islam did not compare favorably to that available in the public schools of Flint.

III
In this appeal, Robert raises the following issues:
1) Did the chancery court violate Robert's constitutional right to religious freedom by unfairly considering Robert's religion in awarding Debra custody of their children?
2) Did Debra present an insufficient case for divorce by reason of habitual cruel and inhuman treatment, so that the chancery court erred in granting her a divorce on that basis?
3) Did the chancery court err in denying Robert's motion for a new trial?
Debra has filed no brief in response to Robert's claims of error by the chancery court. It has been generally held in this jurisdiction that Debra's failure to file a brief on appeal "is tantamount to confession" of the errors alleged by the appellant. Price v. Price, 430 So.2d 848, 849 (Miss. 1983); Green v. Green, 317 So.2d 392 (Miss. 1975); Charles F. Hayes & Associates, Inc. v. Blue, 233 So.2d 127 (Miss. 1970). Automatic reversal is not required, however; Robert's argument should at least create enough doubt in the judiciousness of the trial court's judgment that this Court cannot "say with confidence that the case should be affirmed." (quoting Griffin v. Breckenridge, 204 So.2d 855, 855 (Miss. *1243 1967)) See First Mobile Home Corporation v. Little, 298 So.2d 676, 684 (Miss. 1974); Anderson v. Rieveley, 218 Miss. 211, 67 So.2d 249 (1953); W.T. Raleigh Co. v. Armstrong, 165 Miss. 380, 140 So. 527 (1932). Moreover, where child custody is at issue, the Court is compelled to review the record, despite a failure to file a brief by Debra. Sparkman v. Sparkman, 441 So.2d 1361, 1362 (Miss. 1983); Garceau v. Roberts, 363 So.2d 249, 250 (Miss. 1978).

A. Religious Freedom
Robert contends that the chancellor violated his constitutional right to religious freedom by awarding custody of the children to Debra, based largely on disagreements the chancellor had with many of the teachings of Robert's religion. The first Amendment to the United States provides, "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. I. Similarly, the Mississippi Constitution provides, "[N]o preference shall be given to any religious sect or mode of worship; but the free enjoyment of all religious sentiments and the different modes of worship shall be held sacred." Miss.Const. Art. III, § 18.
In Sherbert v. Verner, 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963), the United States Supreme Court held:
The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious beliefs as such, Cantwell v. Connecticut, 310 U.S. 296, 303, 84 L.Ed. 1213, 1217, 60 S.Ct. 900 [903] [(1940)]. Government may neither compel affirmation of a repugnant belief, Torcaso v. Watkins, 367 U.S. 488, 6 L.Ed.2d 982, 81 S.Ct. 1680 [(1961)], nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities, Fowler v. Rhode Island, 345 U.S. 67, 97 L.Ed. 828, 73 S.Ct. 526 [(1953)]. (Emphasis added.)
Consequently, the Court held that substantial state infringements upon an individual's right to religious freedom may only be justified by a compelling state interest. 374 U.S. at 406, 83 S.Ct. at 1795, 10 L.Ed.2d at 972. In that case, the Court found that such a substantial infringement upon religious freedom had occurred where the South Carolina Employment Security Commission denied unemployment benefits to a woman of the Seventh-Day Adventist faith on the ground that she refused to take employment requiring her to work on Saturdays, which was her Sabbath. 374 U.S. at 403-406, 83 S.Ct. at 1793-1795. The Court noted:
The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.
374 U.S. at 404, 83 S.Ct. at 1794.
Robert contends that the decision of the chancery court awarding custody of his children to his wife similarly impacts his right to exercise religious freedom. He argues that he is forced to make a choice between adhering to his faith and losing his children on the one hand, and denouncing his religion and keeping his children on the other hand.
This Court has already dealt with the question of whether a chancery court may deprive a parent of the custody of her child based on the parent's adherence to a particular religious belief. In Harris v. Harris, 343 So.2d 762 (Miss. 1977), Mrs. Harris was granted absolute custody of the couple's son. Subsequently, the Chancery Court of Tishomingo County modified the couple's divorce decree so as to grant Mr. Harris primary custody of the child and give Mrs. Harris limited visitation rights at the home of the father. Mrs. Harris was a member of the Free Will Holiness Pentecostal Church in Red Bay, Alabama. The Church was part of a fundamentalist sect that believed in snake handling. The chancellor based his modification on a determination that exposure to such doctrines was not in the best interests of the child, who was five *1244 years old at the time. 343 So.2d at 763. This Court reversed, holding that "[t]he chancery court had no authority to dictate to Mrs. Harris what religion she should teach her child so long as it did not involve exposing him to physical danger or to what society in general deems immoral practices." Id. at 764. The record reflected no proof that Mrs. Harris' attendance at her church had exposed the child to risk of being bitten by a snake. Id.
In the instant case, Robert bases his claim of religious discrimination on chiefly two things: 1) exchanges on the record where the chancellor interjected his personal opinion that certain Black Muslim doctrines were wrong; and 2) a large segment of the court's opinion which contrasts the lifestyles between the University and mainstream society and concludes with an award of custody of the Muhammads' children to Debra. Robert contends that contrasting lifestyles was the basis for the custody award to Debra.
There were indeed several points during the trial phase of this case where the chancellor expressed in open court that he disapproved of the Black Muslim teaching that white people are devils. During preliminary proceedings at the initial April 2, 1991, hearing, the chancellor sua sponte interjected his personal opinion into the following exchange between Marvin Muhammad and Debra Muhammad's lawyer:
MR. BLALOCK (COUNSEL FOR DEBRA MUHAMMAD): And also is it part of your religion that you have some problem against white people, Caucasian people?
MARVIN MUHAMMAD: Yes.
MR. BLALOCK: And you consider us devils?
MARVIN MUHAMMAD: Yes.
MR. BLALOCK: And you will teach the children that white men are devils?
MARVIN MUHAMMAD: I will teach the children the truth.
MR. BLALOCK: I'm asking you will you teach them that white men are devils?
MARVIN MUHAMMAD: That the white man is the devil?
MR. BLALOCK: Yes, sir.
MARVIN MUHAMMAD: Yes, sir.
MR. BLALOCK: And you bear that feeling and you make sure that everybody in your religion bears that same type of belief?
MARVIN MUHAMMAD: For four hundred years we have been over here being mistreated by you.
THE COURT: By him?
MARVIN MUHAMMAD: Not you in particular.
MR. BLALOCK: Am I a devil?
MARVIN MUHAMMAD: If you had been in the days of your forefathers 
[ALL SPEAK AT ONCE; UNINTELLIGIBLE]
THE COURT: Wait a minute, that's so tired, that's such a tired argument. Please don't bore me with that.
MARVIN MUHAMMAD: Well, he brought it up, Your Honor.
THE COURT: I don't care if he brings it up. I'm telling you that that's the tiredest argument that there has ever been. Please don't give me that.
MARVIN MUHAMMAD: You don't know what I was going to give you.
THE COURT: I've heard what you've already said and 
MARVIN MUHAMMAD: You wanted the truth, didn't you?
THE COURT: Yeah, and that ain't the truth. That's a bunch of bull as far I'm concerned. It's no worse than a man coming in here and wearing a white robe and talking about how no good blacks are because they are black.
MARVIN MUHAMMAD: No, I didn't enslave you all for four hundred years; you all did that to us.
THE COURT: And I didn't enslave you. I didn't enslave anybody.
MARVIN MUHAMMAD: So I'm not going to make an apology to you for your mistreatment of me.
THE COURT: Wait a minute, whoa. I've mistreated you?

*1245 MARVIN MUHAMMAD: You as a people have mistreated us as a people.
THE COURT: Oh, that's a bunch of bull. I have not done anything to you, and it  of course, we have a difference of philosophies, but I will tell you this: I don't treat and teach my children to hate anybody because of the color of their skin. In fact, I say you should never do that. But you want equality on one side and you want it back on the other. It don't work that way.
MARVIN MUHAMMAD: Allah has revealed what I just said, that the Caucasian is the devil. So, I'm not going to deny that simply for advantage, for some kind of advantage from you.
THE COURT: I guess a guy that's in a Ku Klux Klan could say the same thing, that Jesus Christ came to him in a dream and told him that black people were devils.
MARVIN MUHAMMAD: Well, they've inflicted enough hatred and murder on my people, so they obviously felt something about us that was unjustified, but I didn't come to Europe and steal white people from their land and enslave them; y'all came to Africa and stole us, so don't try to put that jacket me.
THE COURT: I've never been to Africa in my life. I've never been to Africa in my life.
MR. BLALOCK: And don't tell me about my people.
MARVIN MUHAMMAD: Yes, I'm telling you about your people.
MR. BLALOCK: My people are American Indians who owned this land before you did.
MARVIN MUHAMMAD: Now, I don't know about what your people were. And I'm not trying to take this land. I only want to take my people from this land.
THE COURT: Don't  let's get back to 
MR. BLALOCK: Let's get back into some other things .. .
At the conclusion of Debra Muhammad's cross examination on April 2, 1991, the Court interposed with the following questioning of Debra Muhammad:
THE COURT: Let me ask you a question, Mrs. Muhammad. I preface my question with a remark. People feel different ways about things. We raise our children ordinarily to pretty much reflect what we believe. You know, I don't believe people should use drugs, and I raise my children not to use drugs. Yes, sir and No, sir and Yes, ma'am and that thing. Now, I've heard Mr. [Robert] Muhammad as to what his plan would be if he were to have the custody of the children.[1] What would yours be? How would you raise them and just tell me generally about that?
DEBRA MUHAMMAD: I would raise them to respect people and to believe in God. And don't do to other people what you don't want them to do to you.
THE COURT: Well, of course I'm white so I guess I'm sensitive somewhat to somebody calling me a devil or whatever. I don't feel very devilish ... or teaching people that I'm a devil because of what happened in the past  which is fine; that's his thing. But I have a different philosophy in raising my children; that is, I don't tell them, you know, you're in this particular situation because maybe blacks did so-and-so or Indians did so-and-so or Chinese or tall people or anything else. Our children are raised  we don't make a big distinction about race. It's just not a big point in our house, not a point at all. But if you had the children, what would your posture be on that type of thing?
DEBRA MUHAMMAD: I wouldn't raise them to be prejudiced against anyone. If you don't like someone, you don't like someone because that person did something *1246 to you. It isn't like that person because their great-great-great somebody did something to them . .. or to your people?
During the cross examination of Marvin Muhammad at the October 30, 1991, hearing, the following exchange occurred:
MR. BLALOCK: But that's your goal, to have all your Followers live in that area or around you or 
MARVIN MUHAMMAD; My goal is to have me and my people out of America, out of the scrutiny of others than our own kind.
MR. BLALOCK: I mean, do you anticipate moving to another country?
MARVIN MUHAMMAD: I anticipate moving to our own country 
MR. BLALOCK: And where would that be?
MARVIN MUHAMMAD:  wherever that will be, even if it's here in America. If this Government would give us a place, a separate state or territory to ourselves as the Honorable Elijah Muhammad asked for, that would be our country.
MR. BLALOCK: So in that regard then you do not participate in the political processes at all of this country?
MARVIN MUHAMMAD: No, I don't see any hope for our people by participating in  to vote for someone to rule over us that has enslaved us for the past four hundred years, no, I don't want to be up under Caucasian people any more.
THE COURT: Let me ask you this: Your Supervisor in your District, isn't he black?
MARVIN MUHAMMAD: I'm not sure. I guess he is. I guess he would be.
THE COURT: Has he enslaved you for four hundred years?
MARVIN MUHAMMAD: Well, that was not my point ...
At other points subsequent in the proceedings, the chancellor continued to express his disagreement with the teaching that white people are devils but also clearly stated that his disagreement with such teachings would play no part in his decision. At the conclusion of a cross examination of Robert Muhammad at the October 30, 1991, the following exchange took place:
THE COURT [TO ROBERT MUHAMMAD]: There a lot of things you say I completely one hundred percent agree with. I don't like being called a devil but on the other hand 
ROBERT MUHAMMAD: My children would never come up and call you that.
THE COURT: No, but you did, but nonetheless, that makes no difference.
ROBERT MUHAMMAD: I didn't call you that. You know, he (Mr. Blalock) asked me were we going to teach white people were the devil, and I have never said that to you and I hope that when I do talk that I'm being respectful, and if I'm not you can tell me and I will correct myself because it's not my intentions to be disrespectful to anyone.
THE COURT: I don't think it ever has been.
ROBERT MUHAMMAD: Okay, but as far as what we teach our children, I 
THE COURT: That's what you choose to believe or teach them, and that's fine.

ROBERT MUHAMMAD: Yes, sir. Because the Christians teach their children to believe in Santa Claus, but you know, that's totally unfounded and unheard of. So I can't sit up and debate with you because it would be endless. You know, you have your opinion and you would probably stick to it, and I'd have mine.
THE COURT: That's right. And I'm saying that is your religion and that's  that is not going to have anything to do with this decision.

ROBERT MUHAMMAD: Yes, sir.
THE COURT: There are white people who would sit up there and tell you that blacks are parasites on society, and you say that whites are devils. I think all of y'all are wrong, but nonetheless, that's your opinion. So that hasn't got anything to do with anything.

*1247 At the hearing concerning Robert's motion for new trial, he expressed to the court that he believed the court had unfairly and prejudicially employed his religion against him in awarding custody to Debra. He pointed to the extensive comparison of the University and mainstream American society. The court explained its purpose as follows:
THE COURT: Thank you. Let me first go to the issue of the business of your religion. At one point Mr. Muhammad and Mrs. Muhammad came to my office and brought an ex parte order, and we had a discussion about that. I'd like to have a copy of my Opinion  any of you have that? [court is tendered copy of his opinion.] Now what I said was:
"This opinion has dealt with the tenets and practices of the Islamic Religion for a specific reason. The folkways and mores of the followers of Islam are different from mainstream America. Being different does not infer being wrong, but it does pose distinct problems in the adjudication of this case."

Now, the reason that gave me a problem would be . .. it would be the same problem if there were a Christian and a Jew that had married and were getting a divorce, and one wanted the child brought up in the Jewish religion and one wanted the child brought up in the Christian religion. It poses a problem for the Court who's got to make a decision about that. You know, can't be done both ways. There are some things in your religion that I don't personally agree with, and I told you that... . But I also said in this Opinion and said at the trial that there are a lot of things I see good about it. There is no whiskey and no tobacco and no drugs. And I think that's good, and I wish that more folks in this country would do just that. Now that's something you've got in common with Mr. Blalock's religion. They don't have tobacco or drugs or caffeine or whiskey. I don't disagree with that. I did tell you that I thought it was wrong that people teach their children that any other race or any other people are devils or bad or whatever connotations you want to put on that. But that's just my personal belief. That's your right to teach them that. I don't agree with it, and I don't agree with white people telling their children that blacks are no good, I don't agree with Indians telling their people that Chinese are no good. That's just me. I certainly could hardly have been biased in judging Mr. Muhammad. In fact, I thought I was right complimentary. I think he's a good man, I think he's very moral, there are a lot of things that he believes in that I believe in.
Now, the problem gets to be in bringing up your children in a situation out there where there is terrible overcrowding, and that may be all right for you. And that may be all right for somebody who is truly dedicated to it. People have gone through far worse because they believed in ... (ellipsis in text) or for their religion. In the Christian religion the early Christians were fed to lions. I wouldn't particularly want to see somebody's child fed to a lion; and if I could do something to keep them out of that, I guess probably I would. But, when people are dedicated enough, they will endure things like that. You've got terrible overcrowding out there. You most generally are low on money there. But I'm not saying that won't improve, and I hope it does for you, Mr. Muhammad. I don't feel threatened by your religion or by you or by you, Mr. Muhammad. But your school is unaccredited, there's only one or two teachers, one main teacher, a very bright person . .. I don't know that your children will forever want to be Islamic, and if they weren't, then they would have no accredited schools, they would have a hard time, a difficult time getting into a college.
Now, as far as your personal right to practice your religion, that's your business, that's your business and nobody else's. And certainly, I don't think the court in determining custody of children was telling you that you couldn't practice Islam. And it seems, if I remember, it's been a while ... (ellipsis included in text) *1248 I am and intended to grant you specific visitation which would be lengthy visitation... .
The chancery court's opinion obviously does engage in a comparison of the lifestyle at the University of Islam versus that generally existing in mainstream American society. That comparison, however, does not evince a religious bias against Robert under the circumstances of this case. At the University of Islam, religion permeates virtually every aspect of life. It is impossible to discuss the University's relative merits as a living environment for children without at least indirectly bringing in religious doctrine. Assessment of those relative merits is the hallmark inquiry for a child custody case. See, e.g., Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983). The chancellor did engage in inappropriate judicial conduct with his sua sponte interjection of personal opinion. See Middleton v. Evers, 515 So.2d 940 (Miss. 1987). This served, however, only to expose a view held by the chancellor that in ordinary circumstances would be present but tacit. The chancellor dealt with his views in an open and forthright manner. He was careful to point out in the opinion and in several later stages of the proceedings that religious doctrine and beliefs in and of themselves would play no part in his decision. The record simply does not support the contention that the chancellor's views so overwhelmed his reason that his decision on the issues cannot be accorded the same degree of respect as is ordinarily enjoyed by the findings of a trial court. Where the parties have competing religious views it is impossible to have both views represented by a single jurist. This is especially true where, as here, religious doctrine embrace a negative view about a particular race. As to this basis for reversal, we can say with confidence that the chancellor should be affirmed.

B. Divorce
Robert next contends that the trial court erred in granting a divorce to Debra on the ground of "habitual cruel and inhuman treatment." He argues that insufficient evidence was presented at trial by Debra to meet the standard under Mississippi law for granting a divorce on this ground. He claims that the chancellor's findings only indicate at best that Debra was unwilling to follow the precepts of the Muslim religion.
The chancellor set forth the following discussion in his opinion with respect to a finding of habitual cruel and inhuman treatment:
While the most devout and dedicated female followers of Islam apparently do not mind the conditions that exist in the community, the Defendant and Counter-Plaintiff did. She, her husband and two children lived in one room of a small house. There was a lack of privacy. She was unable to go into town or to travel as she pleased. She had no control of personal finances. She had telephone calls withheld from her and her mail was censored. She complained about her diet and the lack of food. Curiously, although the members of the community disdain the government of the United States and its political subdivisions, they allowed the Defendant and Cross-Plaintiff to participate in the WIC Program to secure milk and juice for her children. However, the milk was used in the bakery, and the Defendant had to seek permission from Marvin Muhammad to get diapers for her children. Finally, the Defendant suffered physical abuse at the hands of the Plaintiff. She left Jefferson County in the middle of the night with her children, and the Plaintiff has had very little contact with them since that time.
It is my opinion that these conditions constitute habitual cruel and inhuman treatment so as to entitle the Defendant and Counter-Plaintiff to a divorce from the Plaintiff and Counter-Plaintiff.
This Court has defined cruel and inhuman treatment in this vein as "conduct endangering life, limb, or health, or creating reasonable apprehension of danger, or unnatural and infamous conduct making the marital relation revolting." Bland v. Bland, 620 So.2d 543, 545 (Miss. 1993); *1249 Howard v. Howard, 243 Miss. 301, 138 So.2d 292, 293 (1962); Russell v. Russell, 157 Miss. 425, 430-31, 128 So. 270, 272 (1930). The finding of the chancellor on whether Robert's conduct rose to this level should not be disturbed on appellate review unless "manifestly wrong." Nichols v. Tedder, 547 So.2d 766, 781 (Miss. 1989); Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986); Chaffin v. Chaffin, 437 So.2d 384, 386 (Miss. 1983). Despite the standard's general demand for endangerment to one's health, this Court has held on numerous occasions that the harm complained of by the plaintiff spouse need not derive from physical attack by the offending spouse. See, e.g., Cherry v. Cherry, 593 So.2d 13 (Miss. 1991); Parker v. Parker, 519 So.2d 1232 (Miss. 1988); Chaffin v. Chaffin, 437 So.2d 384 (Miss. 1983). In Cherry, we said a trial court erred in not granting a wife a divorce on the ground of cruel and inhuman treatment, where she showed that her husband had been impotent for a period of time and had dressed up in women's clothing on a few occasions. 593 So.2d 13, 17. In Parker, we ruled that the a chancery court should have awarded a divorce on the basis of cruel and inhuman treatment, where the wife had shown various acts of verbal and nonphysical abuse by her husband. 519 So.2d 1232, 1233-1235. In Chaffin, we held that a spouse's habitual nagging and continual absence from home constituted a sufficient basis for a divorce grounded in cruel and inhuman treatment. 437 So.2d 384, 385-386.
Even so, the case at bar demands extrapolation from our prior precedents, because it presents a claim of a nature not squarely confronted by this Court before. The Missouri Court of Appeals decided a similar case in Rogers v. Rogers, 430 S.W.2d 305 (Mo. 1968). In that case, a husband filed for divorce on the ground of "indignities," a statutory ground in that state, after he became deeply dissatisfied with life in a religious community known as the Zion's Order of the Sons of Levi, and his wife preferred to stay in the community. The wife had become interested in and joined the sect first. 430 S.W.2d 305, 310. The couple subsequently sold all of their property and moved to the commune, donating all of the proceeds of their property sales to the Order. Id. at 307-308. Eventually, the husband came to resent the authoritarian nature of the organization and objected to the Order's health practices, dietary practices, and policy of arrogating all of the members' work pay into the organization's common fund. Id. at 308. The husband eventually left the community and went home. By the time he left, he was very thin and suffered from nervous condition and tularemia. Id. The Missouri Court of Appeals held that the husband was entitled to a divorce. Id. at 311. In support of its decision, the court noted:
For three and a half years he remained with the order for the sake of his marriage and his children. Deprived, at least in his view, of his rightful authority as a husband and father, made subject and subservient to a group of men he disliked and mistrusted and stripped of all economic incentive, the defendant found life with the order degrading and eventually unbearable. Ultimately, his physical health and emotional well-being were adversely affected. The evidence was sufficient to warrant granting a divorce on the ground of general indignities.
Id.
A number of other courts have decided cases where the defendant spouse himself engaged in religiously-motivated actions that were claimed by the other spouse to have created an unbearable set of living circumstances. Many of those courts have given indications that, as with other cruelty divorce cases, the polestar consideration continues to be the intolerableness of the plight created for the nonoffending spouse. See Sinclair v. Sinclair, 204 Kan. 240, 461 P.2d 750 (1969); Golden v. Arons, 36 N.J. Super. 371, 115 A.2d 639 (1955); Mertens v. Mertens, 38 Wash.2d 55, 227 P.2d 724 (1951); Smith v. Smith, 61 Ariz. 373, 149 P.2d 683 (1944); Wilson v. Wilson, 58 Cal. App.2d 641, 137 P.2d 700 (1943); Krauss v. Krauss, 163 La. 218, 111 So. 683 (1927). In Sinclair, the Kansas Supreme Court noted:

*1250 The religious zeal of a spouse may be carried to such lengths that domestic harmony is completely disrupted and the legitimate ends of matrimony destroyed, with the result that the life of the complaining spouse is rendered intolerable. (cites omitted). Such a course of conduct, we believe, characterizes behavior amounting to extreme cruelty within the purview of our divorce statute.
204 Kan. 240, 461 P.2d 750, 752. In Krauss, the Louisiana Supreme Court observed, "The courts will look, not so much to the originating cause of the cruel treatment, but to the nature and character of the treatment itself in determining the question as to whether it amounts to such cruelty as to warrant a separation." 163 La. 218, 111 So. 683, 685.
Certainly, the case at bar is a novel one on the question of divorce by reason of habitual cruel and inhuman treatment. The most common scenario for this type of action is undoubtedly where one spouse engages in overt physical or verbal actions of such a harsh and continuing nature that the other spouse cannot continue to cohabit with the offending spouse without threat of physical or mental harm. In the instant case, Debra Muhammad only testified to one incident where her husband used physical force against her, and that incident was arguably provoked by her. The record gives no reason to believe that Robert Muhammad was unordinarily likely to physically abuse Mrs. Muhammad in the future. To this effect, the chancellor noted during the hearing for new trial, "I don't think that Mrs. Muhammad may have felt that her life was in danger. I don't know that she was in fact in any danger. I don't think that Mr. Muhammad is an overtly violent man... ." There is also nothing in the record which indicates that Robert Muhammad is verbally abusive.
Nevertheless, Debra's case presents a compelling set of circumstances for a grant of divorce by way of habitual cruel and inhuman treatment. Although, Robert himself physically did little to harm Debra, the rules and social order of the University relegated Debra to a status and set of living conditions that would be unbearable to a great many, if not a majority, of the women living in our modern society. Debra's mother indicated that her daughter was on the verge of a nervous breakdown. For Debra, staying in her marital relationship meant continuing to endure the lot which she found oppressive. The only way she could escape these conditions was to leave her marital relationship. Therefore, if a spouse's actions which cause deep personal misery that has no foreseeable end is the gravamen of the action for divorce by reason of habitual cruel and unusual treatment, we cannot say that the chancellor's determination that Debra's case warranted a divorce was "manifestly wrong." We deal here with a civil dimension, not a religious one. The question is not to be answered by our view of what is spiritually appropriate, but rather by our determination of the rights of the parties under the laws of our state.

C. Motion for New Trial
Robert's final contention is that the chancery court committed reversible error in failing to grant his motion for new trial. He based his motion for new trial on the two previously noted contentions of error that Robert is now making to this Court: 1) that the chancellor gave undue weight to his religious beliefs and practices in awarding custody of the couple's children to Debra; and 2) that the proof submitted by Debra failed to meet the standard for divorce based on habitual cruel and inhuman treatment.
Trial judges are vested with considerable discretion in ruling on motions for new trial, e.g., Burnham v. Tabb, 508 So.2d 1072, 1075 (Miss. 1987); and it has been noted on numerous occasions that "[t]his Court will reverse a trial judge's denial of request for new trial only when such denial amounts to a (sic) abuse of that judge's discretion." E.g., Bobby Kitchens, Inc. v. Mississippi Insurance Guaranty Association, 560 So.2d 129, 132 (Miss. 1989); Maxwell v. Illinois Central Gulf R.R., 513 So.2d 901, 908 (Miss. 1987); Burnham, 508 So.2d at 1075.
*1251 As noted above in sections I and II, the chancellor's decisions granting Debra divorce and custody do not appear to be manifest error under the facts of this case. Although the chancellor did make some undoubtedly inappropriate statements of personal opinion, it does not appear that the chancellor's decisions were the result of any bias and they are supported by the evidence.

CONCLUSION
For the foregoing reasons the decision of the chancery court is affirmed.
AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., SULLIVAN, PITTMAN, and JAMES L. ROBERTS, Jr., JJ., concur.
SMITH, J., dissents with separate written opinion joined by McRAE, J.
SMITH, Justice, dissenting:
While wanting to grant these parties a divorce and to also overlook the chancellor's comments during this case, I cannot agree to do so. A case for divorce based on habitual, cruel and inhuman treatment has not been proved, and the comments of the chancellor are too numerous to be ignored. I therefore dissent from the opinion of the majority.
Robert J. Muhammad and Debra Muhammad, formerly Robert and Debra Wilson, were married on September 17, 1983, in Flint, Michigan. They lived in Flint until 1987 when they moved to the Islamic community in French Lick, Jefferson County, Mississippi, known as the University of Islam. Robert and Debra had already been experiencing marital difficulties before moving to the University. Debra indicated that she tried Islam and moved to the University with Robert in an effort to save her marriage.
Debra testified that she had been unhappy with the lifestyle at the University from the moment she arrived there. The approximately twenty followers of Marvin Muhammad lived in two houses of two to three bedrooms each. Each family occupied one room in the houses. There was one bathroom in the house that Robert and Debra lived in. Each family was allotted daily time segments for bathroom privileges.
Members of the community did not control their own finances. Debra also complained about her diet and the lack of food.
In the present case, Debra Muhammad only testified to one incident where her husband used physical force and that incident was arguably provoked by her. The chancellor noted, "I don't think that Mrs. Muhammad may have felt that her life was in danger. I don't know that she was in fact in any danger. I don't think that Mr. Muhammad is an overtly violent man." There was no evidence that Robert was verbally abusive.
The chancellor's findings in his opinion on habitual cruel and inhuman treatment were the following:
While the most devout and dedicated female followers of Islam apparently do not mind the conditions that exist in the community, the Defendant and Counter-Plaintiff did. She, her husband and two children lived in one room of a small house. There was a lack of privacy. She was unable to go into town or to travel as she pleased. She had no control of personal finances. She had telephone calls withheld from her and her mail was censored. She complained about her diet and the lack of food. Curiously, although the members of the community disdain the government of the United States and its political subdivisions, they allowed the Defendant and Cross-Plaintiff to participate in the WIC Program to secure milk and juice for her children. However, the milk was used in the bakery, and the Defendant had to seek permission from Marvin Muhammad to get diapers for her children. Finally, the Defendant suffered physical abuse at the hands of the Plaintiff. She left Jefferson County in the middle of the night with her children, and the Plaintiff has had little contact with them since that time.

*1252 It is my opinion that these conditions constitute habitual cruel and inhuman treatment so as to entitle the Defendant and Counter-Plaintiff to a divorce from he Plaintiff and Counter-Plaintiff.
In setting out his findings on the grounds for divorce, the chancellor spent the bulk of the opinion discussing the Islamic religion and the University of Islam and comparing them to mainstream America. Marvin Muhammad receives as much or more attention and blame in the marriage as does Robert. The chancellor did not find any conduct by Robert which would entitle Debra to a divorce. Under Mississippi law, the plaintiff must prove this ground for divorce by a preponderance of the credible evidence. Cooper v. Cooper, 518 So.2d 664, 666 (Miss. 1988). This was not done.
For adherents to the Islamic religion the community life is not cruel and inhuman. As Debra testified, she voluntarily joined the community in what ultimately was a failed attempt to save her marriage.
The standard for granting a divorce in Mississippi on the ground of habitual cruel and inhuman treatment has been stated as follows:
The conduct of the offending spouse must be so unkind as to be cruel, that is, so unreasonably harsh and severe as to be inhumane, so lacking in human qualities, so unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb, or health. And finally, such conduct must be habitual, or continued so long, that its recurrence may be reasonably expected whenever occasion or opportunity presents itself.
Burnett v. Burnett, 271 So.2d 90, 92 (Miss. 1972), quoted in Gallaspy v. Gallaspy, 459 So.2d 283, 285 (Miss. 1984).
Looking at the chancellor's findings and the testimony, it is clear that it was manifest error to grant the divorce on habitual cruel and inhuman grounds. There is no testimony that indicated Debra was ever in reasonable apprehension of danger to life, limb, or health. Debra's complaints were not with her husband specifically but with the living conditions in the community they chose to live in. These circumstances were not imposed on or directed at her by her husband but were dictated by Marvin Muhammad, the leader of the community. As previously noted, the "physical abuse" was one isolated incident in which Debra was not without fault. The chancellor has not set out any conduct by Robert that fits within the criteria required by our law for granting this divorce on habitual, cruel and inhuman treatment. Debra's general dissatisfaction with the community lifestyle is not sufficient.
The majority has cited several cases from Mississippi and elsewhere which are not factually similar and which add nothing to the erroneous conclusion of the chancellor.
I am persuaded that the chancellor should have considered Robert's complaint for divorce on desertion or allowed the parties to consider irreconcilable differences grounds after dismissing Debra's cross-complaint. See, e.g., Gardner v. Gardner, 618 So.2d 108, 113 (Miss. 1993).
Although I would be reluctant to term the chancellor's behavior a violation of the constitutional right to religious freedom, his conduct cannot be discounted and undermines confidence in his determination of child custody.
As already set out in the majority opinion, the chancellor's comments were numerous and far exceeded the "occasional display of irritation" this Court found excusable in Middleton v. Evers, 515 So.2d 940, 942 (Miss. 1987). Even though the chancellor stated in his opinion and in later stages of the proceedings that religious doctrine and beliefs did not play any part in his decision, these assurances do little to restore confidence in his decision. His displeasure with the teachings and tenets of this religious group was obvious. In contrast to the majority, I believe that the chancellor not only "challenged" but broke through "the barrier for appropriate judicial conduct with his sua sponte interjection of personal opinion." For this reason I would remand the issue of child custody *1253 and would caution the chancellor against injecting his personal opinions into proceedings, to the extent that his impartiality may be questioned.
For these reasons, I dissent.
McRAE, J., joins this Opinion.
NOTES
[1] Robert Muhammad testified during his cross-examination on April 2, 1991, that if he had custody of the children, he would raise them according to his religion, which included teaching them that white people are devils. He added that teaching them this doctrine is not synonymous with teaching them to hate white people. He said he would teach them to respect all people.