KING, C.J.,
for the Court:
¶ 1. The Jasper County Chancery Court denied LaKenya Forthner a divorce on the ground of cruel and inhuman treatment, granted her custody of the minor children, and denied the request of her husband, Desmond Forthner Sr., for separate maintenance. LaKenya does not appeal the denial of a divorce. However, Desmond has appealed in this matter, raising four issues: (1) whether the chancellor erred in the evaluation of the Albright factors, (2) whether the chancellor erred in refusing to grant separate maintenance to Desmond, (3) whether the chancellor erred by violating Desmond’s constitutional right to freedom of religion, and (4) whether the chancellor erred in refusing to grant Desmond reasonable attorney’s fees.
¶ 2. Finding no reversible error, we affirm.
FACTS
¶ 3. LaKenya and Desmond were married on June 29, 2002, and one child was born during the marriage. LaKenya has a daughter from a previous relationship, whom Desmond adopted. LaKenya moved out of the marital home and filed for divorce on the ground of habitual cruel inhuman treatment on May 15, 2008. Desmond filed a counter-complaint for legal separation and separate maintenance. The chancellor heard this case in three separate stages: custody hearing, divorce proceeding, and determination of separate maintenance.
¶ 4. On September 9, 2008, the chancellor conducted the custody hearing. The record reveals that both parents were involved in the children’s daily lives. LaK-enya testified that she dedicated a substantial amount of time to furthering her education, and she worked full time. She *1214 also testified that when she was home, she contributed to the household chores, helped the children with their homework, and attended their extra-curricular activities. In 2005, Desmond was in an accident and sustained severe neck and back injuries that rendered him disabled. He testified that as his recovery progressed, he was able to care for the children while LaKenya was at work or school. Both parties agreed that LaKenya’s mother was also helpful in assisting with the care of the children. At the conclusion of the hearing, the chancellor entered an interlocutory order, wherein he awarded primary legal and physical custody of both children to LaKenya, and he provided that LaKen-ya would receive the children’s social-security checks. The chancellor did not order Desmond to make any child-support payments.
¶ 5. The chancellor heard evidence regarding the divorce on January 27, 2009. LaKenya testified that problems in their marriage began in 2002, when Desmond joined a Pentecostal church. LaKenya testified that she does not share Desmond’s religious views and that the conflict between their different religious views ultimately led to the separation. In support of her request for a divorce based on habitual cruel and inhuman treatment, LaKenya testified that: Desmond refused to allow the family to celebrate Christmas; he turned the electricity off during the winter; and he constantly criticized her. LaKenya testified that Desmond routinely told her that she was in danger of “hellfire” and that his newly adopted religious beliefs encouraged an attitude of “his way or no way.” According to LaKenya and LaKenya’s mother, Desmond expected to be treated as “head of the house.” Further frustrating their situation, LaKenya testified that after the accident, Desmond became increasingly angry, which led to physical altercations, especially in regard to their financial affairs.
¶ 6. Desmond admitted that he may have made the statement that LaKenya would be in danger of “hellfire” and that he believed that the husband should be the “head of the house.” Desmond further testified that if there were an award from the litigation concerning the accident, he did not feel like LaKenya was entitled to a portion, and he had not shared any of the insurance proceeds from the totaled vehicle with the family. LaKenya testified that when she attempted to discuss their marital problems, Desmond was mean in return. Desmond testified LaKenya never attempted to discuss their problems.
¶ 7. Finally, the chancellor heard testimony regarding Desmond’s request for separate maintenance. Desmond testified that he did not do anything to cause LaK-enya to leave the marital home. Desmond admitted that they did not have a good marriage. He denied any physical altercations and being controlling over the household finances. Desmond also testified that he had no problem with celebrating Christmas, but he did refuse to lie to his children about Santa Claus. Desmond and LaKen-ya agreed that their differences in religious beliefs was the primary cause of their marital problems. Desmond’s testimony was clear that he loved LaKenya and wanted her to return to the marital home. Desmond wanted to reconcile, while LaKenya did not.
ANALYSIS
¶ 8. The appellate court “employs a limited standard of review in domestic relations cases; that is, [it] will not reverse a chancellor’s findings ‘unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.’ ” Yelverton v. Yelverton, 26 So.3d 1053, 1056 (¶ 11) (Miss.2010) (quoting Phillips v. Phillips, 904 So.2d 999, 1001 (¶ 8) (Miss.2004)).
*1215 1. Albright Analysis
¶ 9. In matters of child custody, the primary consideration of the chancellor must be the best interest of the child. Vaughn v. Davis, 36 So.3d 1261, 1264 (¶ 10) (Miss.2010). In Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), the Mississippi Supreme Court identified several factors that the trial courts must consider in determining the best interest of the child for custody purposes. The court held as follows:
We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school[,] and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent!;] and other factors relevant to the parent-child relationship.

Id.

¶ 10. Desmond argues that the chancellor erred in evaluating the Albright factors. At the conclusion of the hearing on child custody, the chancellor analyzed the Albright factors as follows:
THE COURT: So, those are the facts as testified to by the witnesses. In evaluating that situation, we have to look at the Albright factors. The age of the children. The daughter is nine; the son is five. The son is in kindergarten; the daughter is in regular school, if you will.
The sex of the children. The older child is female; the younger child is male. When you take into account the testimonies] of the parties, the fact that one is five and one is nine, the fact that one is female, [and] one is male, the Court is of the opinion that neither one of those factors favors either the mother or the father.
The continuity of care prior to the separation. They both participated in that. A lot has been made in the fact that [LaKenya] goes to school and has two jobs. That does take time away from her home, but it doesn’t make her a bad parent.
The other side of that coin is in a little over a year she will be a nurse practitioner. She can make very good money; and if the government allows her to, depending on what happens with this bailout situation, she can go anywhere she wants to and buy her a house. She can make very good money. So, she says she is looking out for the future of her children.
At the time there was a period of time when [Desmond] was unavailable to take care of the children after he had his accident. From then until, basically, December of that year, someone else had to do most of that; and, according to the testimony, the Court finds that the responsibility fell on his wife, the mother of these children. But, again, that’s something we can’t necessarily hold against him. He didn’t go out that morning and say, I think I’m going to go break my neck. Those things happen. Accidents happen, the victim of an accident of some sort. I think we determined that was a motorcycle accident. *1216 That’s a whole other story. We won’t get into that sermon just yet.
But there have been times when both the mother and the father had the primary responsibility for the children!,] and there have been times when they both shared that[,] and there have been times when they relied on the maternal grandmother a good bit. At this point in time, the father just prior to the separation probably had a little more of that responsibility because the mother was in school!,] and she was working two jobs.
So, if there is going to be — well, maybe we should say in the final analysis there would be a very slight balance towards the father there. It’s slightly in favor of awarding custody to the father, but it’s very slight. Depending on the time, that could go either way. As we noted, there was a time when the mother bore almost all of that responsibility after his accident; and at this point, and for probably the next year, she is not going to have as much time to spend with the children. So, that slightly favors the father.
The best parenting skills. They both can take care of the children. I see nothing in the testimony to question the parenting skills of either one of them.
Employment factors. As we noted, [LaKenya] is going to school on Thursday nights, right now 6:00 to 9:00 p.m. She has three weeks of that left. She will be [done with class] until January. In January!,] she will start back to school. She will finish in approximately 12 months at which point her education will be completed. She also works 7:00 a.m. to 5:15 p.m.[,] and she works approximately three days per month on the weekends when the children are with their father. She has a heavy load. She is working two jobs and going to school.
The father is not employed. He is disabled. He does do some work around the house on automobiles for people who either pay him or throw him some change, depending on which way you want to see that.
The mother is employed. Her employment has steadily increased during the marriage. She started out as a school nurse. She decided to go back to school. She has received her BS and is on her way to receiving a degree as a nurse practitioner. She has been working on that several years. That factor favors the mother.
The age of the parents. The father says he’s 30. I never did hear any testimony regarding the age of the mother. I’m assuming it’s similar. That factor does not favor either.
Health factors. The health of the children is good.
Physical health of the parents. That factor would have to favor the mother. There is no testimony with regard to any physical or mental infirmities whatsoever. We have already talked about the father’s situation. He does have days when he would not be able to take care of these children. If he goes out in the backyard and he’s painting on somebody’s hood and he twists his back the wrong way, there is a possibility he could wind up in bed a few days on medication that says, Do not drive, may make you drowsy, don’t operate equipment. Those would not be good times to have responsibility of the children. Emotional ties — well, let me back up. The health factor favors the mother.
Emotional ties between the parent and the child. There are two children. And one can glean from the testimony that, as far as the daughter is concerned, the mother has a better relationship with her; and, as far as the son is *1217 concerned, the father has a better relationship with him. That would be a fair interpretation of the evidence. That’s the interpretation I will adopt. That factor favors neither parent.
Moral fitness. There wasn’t a lot made of the issue of the birth of the daughter. There was some testimony about how that came about and the other gentleman involved in that but those are things that happened 9 or 10 or ever how many years ago. That’s not relevant to our issue today.
The Court doesn’t find any evidence directly on point as far as things such as use of alcohol, use of drugs, adultery, things of that nature, the more typical type things you discuss under morality. The factor favors neither.
The stability of the home environment. That’s really difficult to say at this point. This is temporary for both of them. They do own a home. Use and possession and ownership of that home [have] not been determined by the Court and will not for another four months. He is still in the home. She is living with her mother. There is no testimony in the record that either is unstable. The only testimony that the Court could consider at this point is the fact that the father still lives in the marital home[,] and certainly[,] there would be a preference for a stabilizing influence in the lives of these children that they remain in their home[,] but the Court has yet to determine who is going to have use and possession and ownership of that home. So, that issue at this point does not favor either.
The past record of a child’s behavior. At this point the Court sees no testimony to indicate that that factor would favor awarding custody to either the father or the mother.
The preference of the child is not an issue at this point. The oldest child is nine[,] and the youngest is five.
I don’t know if we said so or not[,] but I better cover that so there won’t be a problem with it. As far as the issue of moral fitness of the home environment, that factor does not favor either at this point for the same reasons as we discussed in the stability of the home environment.
Other factors. The maternal grandparent has played a big role in the lives of these children. She has been there to help when they were both in school. When the father was injured, [sic] When the mother was working or going to school at night, whichever, on the weekends, she’s been there to help. That should be considered.
Another factor is there are two children. As a general rule, the children shouldn’t be split. They should stay together. They are brother and sister.
Everybody is entitled to their own religion. That’s a very touchy issue. As Mr. Tullos noted, [it] could even be a constitutional issue. The bottom line is the paramount consideration of this Court in these types of situations must always be the best interest[s] of the children. That is written in literally thousands of cases. But yet we also know that that can be trumped. That can be trumped by constitutional issues. That can be trumped by other issues.
For instance, the right of the Court of Appeals and the Supreme Court to review the record would trump the best interests] of the children. Jethrow, I think is that particular case. Their right to make a decision on appeal trumps the best interests] of the children. So, the best interest is not in truth and in fact the very top number one thing on the list, but it should be up there somewhere.
The best interests] of the children [are] now and will always be the main *1218 issue in this Court, but that’s not true everywhere.
Taking that into account, the Court has absolutely no criticism of [Desmond’s] religion. He has the right to whatever religion he wants, but I think he should stop and think about this attitude of always tell [sic] the children the truth. Some things children have a business of knowing, period, whether it be true or false, for instance. Different parents will have different opinions about how to raise children, obviously. This Court has always taken the position that the best people to make those decisions are the parents. But the reality is when the parents can’t agree on that, when they walk into this courtroom or any other in the [S]tate of Mississippi and they say to some chancellor, [w]e cannot agree. Those issues upon which they cannot agree are then placed in the lap of that particular chancellory and the chancellor gets to make those decisions.
So, I suppose every chancellor has the right to his religious preferences also, just as [Desmond] does. I only say that to say to these two parents, that your first choice should be to work this out between yourselves. That’s what I would personally prefer. That’s what every court would prefer because no one is better equipped to make decisions for these two children than you two. You know them intimately. No court you ever walk in will know them as well as you do.
But the other side of that coin is when you cannot agree, when you walk into a courtroom and you say, [w]e cannot agree, then someone has to make those decisions. You realize that. What you’re doing is delegating the authority to make those decisions to some chancellor whoever happens to be sit[ting] in this chair. That’s the only reason I make that comment is to tell you that not everyone will always agree with your side, [Desmond]; or with your side, [LaKenya].
So, I encourage you to see if you can’t resolve your differences in the future and work together for the best interests] of your children, realizing that on those issues you cannot agree, someone else gets to make the decision. Not you two. Okay? Always remember that.
As stated, the Court has no problem with and finds no fault with [Desmond’s] religion. But I would request that he rethink, and I don’t know if that’s a part of his religion or not, but he rethink the idea that children should always be told the truth. Some things they shouldn’t be told at all, some issues just shouldn’t ever be broached. For instance — well, we won’t even get into that. I’ll leave that up to your imagination.
The other thing that concerns me, as far as other factors, is general equity; and I know that we have to tread lightly here because equity is almost a lost art in the [S]tate of Mississippi, at least. Equity, basically do the right thing. I don’t really get those vibes from [Desmond]. I really don’t. I have concerns.
We talked about the cars. I have concerns about, for instance, he puts money in the account. She puts money in the account; and I get the vibe from him, my understanding of his position is he’s in control of that even though she is putting in two to his one, sometimes three to his one. He said sometimes he puts in 1,000 to 1,200 and sometimes she puts in 2,500 to 3,000. He’s had several different automobiles some of which have been wrecked. He’s received checks on those and then he got the stimulus check, roughly $8,000 with which he shared zero with her, offered her none of it.
*1219 The two children were living with her under the temporary order. [Desmond] had standard visitation!,] and then we went further with that and provided — • this all occurred at the beginning of the summer, so, we specified some specific things for summer vacation!,] and we gave him time to be with the children while she was at work or school. The children were in her custody. That temporary order said that she had custody!,] and yet[,] he goes and stops one of the— redirects, if you will, one of the [s]ocial [s]eeurity checks for the children. That’s the children’s money. That’s not [Desmond’s] money. Those things cause concern.
¶ 11. The chancellor heard the evidence related to custody of the minor children and determined that it was in the best interests of the children that their custody be awarded to LaKenya. Generally, the determination of child custody is a question of fact. A chancellor sitting as a fact-finder in a custody case enjoys wide discretion, and reviewing courts defer to a chancellor’s findings of fact when supported by substantial evidence. Blevins v. Bardwell, 784 So.2d 166, 170 (¶ 12) (Miss.2001).
¶ 12. The chancellor, in accordance with Albright, conducted an analysis and determined that LaKenya should be awarded custody of the minor children. The chancellor found that while many factors favored both parents equally; the factors of employment and physical health favored LaKenya, while the continuity-of-care factor slightly favored Desmond. Additionally, the chancellor also considered: the more stable environment LaKenya could provide where both of her children would be raised together, the substantial involvement of the maternal grandmother, Desmond’s attitude toward the children and Desmond’s negative behavior regarding the family finances. The chancellor’s determination of custody was fully supported by the substantial evidence in the record. This issue is without merit.
2. Separate Maintenance
¶ 13. Desmond argues that the trial court erred in refusing to grant his request for separate maintenance. “Separate maintenance is a court-created equitable relief based upon the marriage relationship and is a judicial command to the husband to resume cohabitation with his wife, or in default thereof, to provide suitable maintenance of her until such time as they may be reconciled to each other.” Perkins v. Perkins, 787 So.2d 1256, 1262 (¶ 15) (Miss.2001). 'The granting of separate maintenance is premised upon the existence of a valid marriage contract, see Weeks v. Weeks, 654 So.2d 33, 36 (Miss.1995), and that there is no significant conduct on the part of the requesting spouse that negatively impacts the enjoyment of the marriage contract. Robinson v. Robinson, 554 So.2d 300, 304 (Miss.1989).
¶ 14. Whether the parties have a valid marriage contract is a question of law, Estate of Barker, 236 Miss. 436, 441, 110 So.2d 615, 616 (1959), which this Court would review de novo. Amiker v. Drugs for Less, Inc., 796 So.2d 942, 945 (¶ 7) (Miss.2000). There is no issue as to whether the Forthners have a valid marriage contract; therefore, no review of this issue is required.
¶ 15. Whether the party requesting separate maintenance has engaged in significant conduct that negatively impacted the enjoyment of the marriage contract is a question of fact to be resolved by the chancellor. Robinson, 554 So.2d at 304. Where the chancellor’s finding of fact is supported by substantial evidence, this Court is obligated to accept and defer to that finding, notwithstanding that this Court might have interpreted the facts of *1220 the case differently. Id. Inextricably interwoven into the deference to the chancellor’s fact-finding is acceptance of his/her findings of individual credibility. See Estate of Burgess ex rel. Burgess v. Trotter, 6 So.3d 1109, 1114 (¶ 19) (Miss.Ct.App.2008).
¶ 16. The record indicates that when the parties married, LaKenya attended a Methodist church, and Desmond attended a Baptist church. After they married, each retained his/her own religious faith. According to Desmond, at some point, he joined a Pentecostal church, which held beliefs significantly different from those of the Baptist church. This difference in religious beliefs became a matter of significant contention between the parties. According to LaKenya, after Desmond joined the Pentecostal church, he became controlling, indicating that things were to be done his way or no way, and constantly stating unless she accepted the tenets of his religion, she was doomed to “hellfire.” According to LaKenya, Desmond’s actions made her feel as if she were merely a piece of property. She felt that Desmond’s religion turned “him into somebody he wasn’t previously” and caused him to turn his back on his family, and she wanted no part of it. Clearly, the actions of Desmond negatively impacted the enjoyment of the marital contract.
¶ 17. While finding that LaKenya had failed to establish any ground for obtaining a divorce, the chancellor did find that her testimony was more credible than Desmond’s. Additionally, the chancellor found that the changes in Desmond as a result of his current religious affiliation created marital discord and was a factor in LaKenya’s decision to leave the marital home. A spouse is not entitled to separate maintenance when that spouse’s conduct has materially contributed to the separation. Marble v. Marble, 457 So.2d 1342, 1343 (Miss.1984) (acknowledging that disputes over differing religious views can be a contributing factor in preventing separate maintenance). This type of conduct may be found as fault sufficient to deny separate maintenance, and as such, the chancellor held that Desmond was not entitled to separate maintenance. Because the record does in fact contain substantial evidence which supports that finding, this issue is without merit.
3. Freedom of Religion
¶ 18. Desmond suggests that the chancellor’s custody determination and denial of separate maintenance is a violation of his constitutional right to freedom of religion. The First Amendment to the United States Constitution guarantees that “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.” U.S. Const, amend. I.
¶ 19. In this case, Desmond bases his claim of religious discrimination on exchanges within the record where the chancellor provided his opinion that Desmond should reconsider his attitude toward the children and “rethink the idea that children should always be told the truth.” Desmond asserts that his idea regarding truthfulness is based on his religious beliefs. The chancellor’s view on Desmond’s attitude was in no way derogatory toward a religious practice.
¶20. The chancellor was careful to point out that Desmond had the right to practice any religion, and the court found no fault in Desmond’s religious beliefs. The supreme court has held that stating an opinion regarding a party’s religious practices is not sufficient to prove bias, or a constitutional violation, without further supporting evidence. See Muhammad v. Muhammad, 622 So.2d 1239, 1248 (Miss.1993). The record simply does not support the contention that the chancellor’s decision regarding the issues of custody *1221 and separate maintenance were in any way influenced by Desmond’s religion. The chancellor’s decisions do not appear to be the result of any bias. Accordingly, we find this issue is without merit.
4. Attorney’s Fees
¶ 21. Desmond further argues the chancellor erred in failing to grant his request for attorney’s fees. An award of attorney’s fees in domestic cases is a matter entrusted to the chancellor’s discretion. Woodell v. Parker, 860 So.2d 781, 790 (¶ 38) (Miss.2003) (citations omitted). Generally, attorney’s fees are not awarded unless the party requesting such fees has demonstrated an inability to pay. Dunn v. Dunn, 609 So.2d 1277, 1287 (Miss.1992). However, attorney’s fees may also be properly awarded where one party’s actions have caused the opposing party to incur additional legal fees. Stuart v. Stuart, 956 So.2d 295, 299 (¶ 20) (Miss.Ct.App.2006) (citation omitted). As neither party prevailed on all issues, there is no suggestion that one party caused the other to incur additional legal fees. Furthermore, Desmond failed to present any evidence concerning the amount of attorney’s fees accrued or his inability to pay. We find no error in the chancellor’s decision to deny Desmond’s request for attorney’s fees.
¶ 22. THE JUDGMENT OF THE JASPER COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. MAXWELL, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. IRVING, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.