# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CA-00259-SCT

*LINDA WATTS BOWEN*

*v.*

*DAVID R. BOWEN*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/21/94 |
| TRIAL JUDGE: | HON. HARRIS SULLIVAN |
| COURT FROM WHICH APPEALED: | SMITH COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ORBIE S. CRAFT |
| ATTORNEY FOR APPELLEE: | DOUGLAS PAUL NANNEY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 2/27/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/20/97 |

**BEFORE SULLIVAN, P.J., SMITH AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Linda Watts Bowen filed for a divorce from David R. Bowen in the chancery court of Smith County, alleging as grounds for divorce habitual cruel and inhuman treatment. David Bowen counterclaimed for divorce on the same grounds. On February 4, 1994, the chancellor denied a divorce to either party, but awarded custody and support of the couple's older child to Linda and custody of the younger child to David. The chancellor also ordered an equitable distribution of marital property. Among other things, the chancellor found that each party owned an undivided one-half interest in the marital home, and awarded use and possession of the home to David. The chancellor denied Linda any portion of David's retirement benefits and denied attorney fees to either party. Aggrieved by the judgment, Linda Bowen appeals to this Court, assigning as error the following issues:

> **I. WHETHER THE CHANCELLOR ERRED IN FAILING TO GRANT LINDA BOWEN A DIVORCE ON THE GROUNDS OF HABITUAL CRUEL AND INHUMAN TREATMENT.**

**II. WHETHER THE CHANCELLOR ERRED IN AWARDING TO DAVID BOWEN CUSTODY OF THE COUPLE'S YOUNGER CHILD, JEREMY BOWEN.**

**III. WHETHER THE CHANCELLOR ERRED IN AWARDING TO DAVID BOWEN USE AND POSSESSION OF THE MARITAL HOME.**

**IV. WHETHER THE CHANCELLOR ERRED IN DENYING LINDA BOWEN ANY PORTION OF DAVID BOWEN'S RETIREMENT BENEFITS, OR IN MAKING AN EQUITABLE DIVISION OF MARITAL PROPERTY IN THE ABSENCE OF A DIVORCE.**

**V. WHETHER THE CHANCELLOR ERRED IN DENYING LINDA BOWEN AN AWARD OF $2,500 IN STIPULATED ATTORNEY FEES.**

## FACTS

¶2. David and Linda Bowen were married on November 27, 1974, of which union two children were born -- Jason, fifteen years old at the time of trial, and Jeremy, age eleven. The parties separated sometime in the fall of 1992. During a four-day trial on the divorce complaints, both parties presented evidence regarding various items which they alleged constituted cruel and inhuman treatment by the other party, not the least of which involved the close relationship between Linda Bowen and another woman, Lynn Grayson.

¶3. Rumors and speculation were rampant in the Raleigh and Cohay, Mississippi, communities that Lynn Grayson was a lesbian and that Linda, due to her close relationship with Lynn, was engaged in an homosexual relationship with Lynn. Linda admitted that David never called her or accused her of being a lesbian, but testified that he "insinuated" it. David admitted telling his sons that "[y]our mother loves another woman more than she loves you." David testified that he did not believe Linda was a lesbian, but that Linda never denied being homosexual and never made any effort to dispel the rumors. David testified that Linda told him that if she were made to choose, she would choose Lynn Grayson over David.

¶4. Sherrie Bowen, David's sister-in-law, testified that on two occasions Linda asked her if she would cover for Linda if Linda were to have an affair. Sherrie testified that on the second occasion, Linda was referring to an affair with Lynn Grayson. David testified that Linda refused to break off her relationship with Lynn in order to keep the family from being embarrassed by the rumors. Jason, the couple's older son, testified that his mother loved Lynn Grayson more than she loved David, but he felt that David, by his insinuations, was responsible for the rumors about his mother. David testified that his younger son, Jeremy, came home one day from school upset because a boy on the school bus had told him "that mama left [David] for another woman."

¶5. Linda denied having any knowledge either of the rumors regarding her and Lynn Grayson or of the aforementioned school bus incident. However, Ruth Hayes, David's sister, testified that she warned Linda of the rumors regarding Linda and Lynn. Also, both Lynn Grayson and Janice Houf, a co-worker at the hospital where both Linda and Lynn worked, testified that Linda and Lynn joked at work about the rumors that they were gay. In addition, Lynn Grayson testified that Linda told her about the school bus incident involving Jeremy.

¶6. David admitted that he and Linda had screamed at each other in front of the children, and that on one occasion he called her a "Baptist Bitch." Linda testified that David had many times called her a "whore" and a "street walker." Jason testified that he heard David call his mother a "bitch" a time or two. Linda testified that the "cruel treatment" of which she complained included the way David always fussed at her for wearing pants and make-up.

¶7. Linda testified that on one occasion, David was complaining about a pair of black pants she was wearing when he threw her onto the bed and started taking the pants off her. She testified that she thought David was going to rape her although he had never raped her before, and that David let her go after she reached up and scratched his face. David testified that no brutality was involved in the incident, characterizing it instead as playful tussling that ended up in laughter.

¶8. David admitted that during an argument on one occasion, he hit the couple's bedroom door with his fist and created a hole in it. He explained that Linda often tried to slam the door on his hand or foot, and that during the incident in question he hit the door when she reached for the doorknob as if to slam it. David admitted that on the same occasion he put a gun barrel into his mouth. He testified that he did not know whether the gun was loaded (in fact it was not), and that he did not know whether the children were in the house at the time. Linda testified that she begged and pleaded with David not to "do it," and that after David left she did not know whether he would shoot himself or come back and shoot her. According to David, when he put the gun barrel into his mouth, Linda told him to "[g]o ahead and pull the trigger."

¶9. David testified that on several occasions, Linda told him she had parked on the side of the road and stuck a gun to her head. He testified he once found his wife lying on the floor with a loaded 44-magnum cocked to her head, and that he once found a suicide note written by her. Linda admitted writing a "desperation" note but denied that it mentioned suicide.

¶10. There was much testimony elicited from both parties regarding a physical altercation between the two that occurred on November 9, 1992, some five days after Linda had signed her complaint for divorce. The incident started during an argument when Linda told David to get out of her way, and David responded, "Your way lies with the Graysons." Linda testified that she took this to be an insinuation that she was gay, so she slapped David. She initially testified that David then threw her onto the floor and hit her twice in the head above the ear, after which she bit him. She later testified that David hit her "back and forth" in the face before throwing her to the floor, after which he hit her several more times. Linda testified that while they were on the floor, she spat in David's face.

¶11. According to David, after he made the comment about the Graysons, Linda swung a starch can at him, hitting him on the left forearm. He testified that he then grabbed her to prevent her from hitting him again, and "[s]he bit the fire out of me." David testified that they then rolled onto the floor, whereupon she spat in his face. He testified that when he let her go she tried to hit him again, so he "popped her twice right there with the back side of my hand." Linda denied hitting David with the starch can, but admitted that "I hit him first."

¶12. Jason testified that when he entered the room where the parties were fighting, he saw his father hit Linda three or four times with his hand. Linda testified that Jeremy went and got the gun and told David to get off her. She admitted that prior to this incident, David had never hit her. After this incident, Linda was admitted to the hospital for observation for three days. Linda testified that after

one day in the hospital, she asked the doctor to let her stay "a while longer."

¶13. Linda testified that she thought David to be an alcoholic, although she admitted that she had never seen him drunk. David testified that at Linda's suggestion, he took a shot of whiskey some nights to help him sleep, as a substitute for taking a muscle relaxer prescribed to him by a doctor for a neck injury. Timothy Bowen, David's brother, testified that once while David was out of town on National Guard duty, Timothy had to go to David's house to help Timothy's wife carry Linda to the bathroom to throw up because Linda was so drunk she could not walk.

¶14. Jason testified that once when his father was angry, David hit the car windshield with his fist, making "spider webs" in it. Jason then testified that the windshield was already broken, stating it "already had a line in it." Jason also testified that about four times his mother had taken the boys out and they had spent the night away from home on a school night.[1] On one such occasion, Jeremy was suffering from pink eye when Linda took both boys around 10:00 or 11:00 at night to the White Oak community, where Jason spent the night at one house and Linda and Jeremy stayed at another. Linda testified that she had called the doctor to be sure it was alright if Jeremy went while he had pink eye. Jason testified he would prefer to be placed in the custody of his mother because "it's a more stable environment." David and Linda each called witnesses who testified that they were fit and suitable parents, and no witnesses testified that either party was not a fit parent.

¶15. At the time of trial, David was employed by Trilogy Communications in Flowood, where his take-home pay was $1,420 to $1,460 per month. He also served as a Major in the Mississippi National Guard, where his take-home pay was $381 for one weekend per month, and $1,600 for two weeks of training camp each summer. Linda was earning about $640 per month. Among other assets, the couple owned a home just outside Raleigh, Mississippi, which David built himself, and which was titled in the names of both parties.

¶16. There was also evidence regarding David's military retirement benefits. David testified that although he had served twenty years in the Mississippi National Guard, his military records mistakenly showed only sixteen years of service. Therefore, David explained, he was not yet entitled to military retirement benefits because he had not received his "twenty-year letter" notifying him of his eligibility to begin receiving benefits upon reaching the age of sixty. David was thirty-eight years old at the time of trial. National Guard Warrant Officer Charles Hamilton testified that if David were to retire from the National Guard at the time of trial with twenty years of service, he would be entitled to begin receiving, upon reaching age sixty, a current value of $540 per month in retirement benefits. Warrant Officer Hamilton further testified that should David not immediately retire, there was no way to then determine what his retirement benefits would be at age sixty due to many variables such as the amount of time served, the rank obtained and the future value of the military pay scale. David testified that he worked for Airwick Industries for eleven-to- thirteen years during the marriage, and that he was vested with a retirement fund there, although he did not know how much the fund was worth.

¶17. Linda testified that she worked at a sewing plant for the first four years of the marriage, and that after the children were born she worked odd jobs such as cleaning houses and driving a school bus. She testified that by working outside the home or, alternatively, by being a homemaker and caring for the welfare of David and the children, she contributed to the acquisition of the couple's property.

Specifically regarding David's military retirement benefits, Linda testified that she shined boots, buckles and helmets, ran to the cleaners, woke David up in the mornings, fixed his lunch, and made sure his duffle bag was packed.

¶18. David stated in his counterclaim for divorce that he in fact did not want to divorce his wife, but that in order to protect his rights, should a divorce be granted, he wanted it to be granted to him rather than to Linda. He testified at trial that he still wanted the marriage to work.

## LAW

## I.

### WHETHER THE CHANCELLOR ERRED IN FAILING TO GRANT LINDA BOWEN A DIVORCE ON THE GROUNDS OF HABITUAL CRUEL AND INHUMAN TREATMENT.

¶19. The grounds of habitual cruel and inhuman treatment may be established by a showing of conduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance. *Daigle v. Daigle*, 626 So. 2d 140, 144 (Miss. 1993); *Gardner v. Gardner*, 618 So. 2d 108, 113-14 (Miss. 1993). Habitual cruel and inhuman treatment may be established by a preponderance of the evidence, and the charge "means something more than unkindness or rudeness or mere incompatibility or want of affection." *Daigle*, 626 So. 2d at 144 (quoting *Smith v. Smith*, 614 So. 2d 394, 396 (Miss. 1993)). On appeal, this Court will overturn the chancery court only when its findings were manifestly wrong and there is no substantial evidence to support those findings. *Daigle*, 626 So. 2d at 144; *Lenoir v. Lenoir*, 611 So. 2d 200, 203 (Miss. 1992).

¶20. Linda contends the evidence showed conduct on the part of David that created a reasonable apprehension of danger, rendering the relationship unsafe for Linda. For this argument she relies on the evidence of David's four alleged acts of violence: (1) David's throwing her onto the bed to take her pants off; (2) David's punching a hole in the bedroom door and putting a gun barrel into his mouth; (3) David's hitting her several times during the November 9, 1992, altercation; and (4) David's hitting the car windshield in front of Jason. Linda also points to David's abusive name-calling and his constant nagging and complaining about her make-up, clothes, and hair style.

¶21. In his bench ruling, the chancellor noted that "[t]here is a great conflict in evidence in this case. And I'm sure that everyone that sat here and heard this case knows. There is almost irreconcilable conflict in many areas of the case . . . . " After a detailed discussion of the proper standard for habitual cruel and inhuman treatment, he found in view of "the totality of all of the circumstances" that:

> . . . most of the evidence in this case had to do with the parties fussing back and forth with each other with a few physical altercations. It seems to the Court that each party gave about as good as they got when they had these physical altercations. The Court is not impressed by the trips of

either party to Magee General Hospital in order to try to bolster their case, which the Court believes was contrived on the part of both parties.

We cannot say the chancellor was manifestly wrong in finding that, in view both of the conflicting evidence and of the apparent responsibility of both parties for the isolated physical altercations , Linda failed to establish a sufficient basis for divorce on these grounds.

¶22. Linda argues in the alternative that David's accusing her of being homosexual constituted "conduct so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse to discharge the duties of marriage." She cites **Hibner v. Hibner**, 217 Miss. 611, 613, 64 So. 2d 756, 757 (1953), for the proposition that false and malicious charges of adultery or immoral conduct which would "naturally tend to cause shame, humiliation or disgrace" would justify a divorce on the grounds of habitual cruel and inhuman treatment.

¶23. Linda admitted, however, that David never called her a lesbian, and there was no evidence that David ever accused her of being such to anyone else, other than "insinuating" it to the children by saying "[y]our mother loves another woman more than she loves you." Even assuming *arguendo* (although there was little or no evidence at trial to suggest it and the chancellor expressly found to the contrary) that David did in fact contribute to the rumors that his wife was a lesbian, the rumors were not proven by a preponderance of the evidence to be either true or false. David's conduct thus did not rise to the level of maliciousness required for the grounds of this type of habitual cruel and inhuman treatment.

¶24. Linda finally argues that she was entitled to a divorce under **Muhammad v. Muhammad**, 622 So. 2d 1239, 1250 (Miss. 1993), *cert. denied*, 510 U.S. 1047 (1994), in which this Court stated that a party is entitled to a divorce "if a spouse's actions which cause deep personal misery that has no foreseeable end is the gravamen of the action for divorce by reason of habitual cruel and inhuman treatment." In that case, Mrs. Muhammad's husband had relocated the family to a "Black Muslim" community whose rules and social order were extremely oppressive to women and dictated virtually every facet of life. *Muhammad*, 622 So. 2d at 1241-42. Linda quotes the *Muhammad* Court in contending that she, like Mrs. Muhammad, was "relegated . . . to a status and set of living conditions that would be unbearable to a great many, if not a majority, of the women living in our modern society." *Id.* at 1250. Linda's situation, however, was hardly comparable to the "novel" scenario and "compelling set of circumstances" which this Court found justified a divorce in *Muhammad*. *Id.* In denying a divorce to either party, the chancellor stated, "The Court believes that really the problem with these parties is mere incompatibility." We hold that the chancellor was not manifestly wrong in this finding, and thus this assignment of error is without merit.

## II.

### WHETHER THE CHANCELLOR ERRED IN AWARDING TO DAVID BOWEN CUSTODY OF THE COUPLE'S YOUNGER CHILD, JEREMY BOWEN.

¶25. The chancellor awarded custody and support of Jason to Linda and custody of Jeremy to David. Linda contends the chancellor violated this Court's principle that "in the absence of some unusual and compelling circumstance dictating otherwise, it is not in the best interest of children to be separated."

*Sellers v. Sellers*, 638 So. 2d 481, 484 (Miss. 1994) (quoting *Sparkman v. Sparkman*, 441 So. 2d 1361, 1363 (Miss. 1983)). This Court both in *Sellers* and in *Sparkman* referred to its dicta in *Mixon v. Bullard*, 217 So. 2d 28, 30-31 (Miss. 1968):

> The Court shall in all cases attempt insofar as possible, to keep the children together in a family unit. It is well recognized that the love and affection of a brother and a sister at the ages of these children is important in the lives of both of them and to deprive them of the association ordinarily would not be in their best interests.

*Sellers*, 638 So. 2d at 484; *Sparkman*, 441 So. 2d at 1362.

¶26. Linda argues that the chancellor erred in separating the children by awarding custody of Jeremy to David.

¶27. There is no *per se* rule against the separation of children. *Sellers*, 638 So. 2d at 484; *Sparkman*, 441 So. 2d at 1362. Rather, the polestar consideration in all child custody cases is the best interest of the child. *Sellers*, 638 So. 2d at 485; *Moak v. Moak*, 631 So. 2d 196, 198 (Miss. 1994). This Court has set forth a number of factors to be considered by chancellors when making custody determinations:

> The age of the child is . . . but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.

*Sellers*, 638 So. 2d at 485 (quoting *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983)). This Court will uphold the factual findings of the chancellor if the findings are not manifestly wrong or substantially erroneous. *Sellers*, 638 So. 2d at 483; *Crow v. Crow*, 622 So. 2d 1226, 1227 (Miss. 1993).

¶28. In making his custody determination in the case *sub judice*, the chancellor thoroughly discussed in the record virtually all of the above factors. He found that due both to Jason's stated preference to be placed in his mother's custody and to his apparent hostility towards his father, it was in Jason's best interest to be placed in the custody of his mother. In determining the custody of Jeremy, the chancellor stated:

> The Court believes that the custody, the paramount custody of Jeremy should be awarded to David. The rumors that Jeremy has heard have hurt him. And this Court finds that they have hurt him more than they have hurt Jason. This Court believes that both children are upset about these rumors. And, of course, there's the evidence that a child on the school bus told Jeremy that he heard that David had lost Linda to another woman. Which if there's anything that will cut a child to the quick, I can't imagine anything that would hurt a boy more for another child to

tell him something like that unless he was to tell him that his father was homosexual. And I don't know which would be worse.

The Court believes that Jeremy could probably not tolerate the continued close relationship that Linda and Lynn Grayson are going to continue by everything that is indicated in this record. This close relationship. Whatever that relationship is. The Court believes that Jeremy could not tolerate it and I hope that Jason can tolerate it, but I believe that Jason can probably handle it better than Jeremy. Based on what I heard Jeremy has been really hurt by the so-called rumors. And whether the relationship is true or not true, it's still hurting these children. And I realize that anybody can go out anywhere and as counsel alluded to the Salem witch trials three hundred years ago, people can start rumors on anybody. And it's a hard thing to overcome once it's started. And I realize that. But in this case I think Linda could have and I think Linda should have done something to alleviate those rumors even if it was cutting off her relationship with Lynn.

The chancellor recognized that "it is an unusual and is usually best not to split custody of the children," but stated that he believed it to be justified and called for in this case for the reasons stated.

¶29. In the case of **Bell v. Bell**, 572 So. 2d 841, 846 (Miss. 1990), this Court affirmed the chancery court decree awarding custody of the divorced couple's seven-year-old son to the mother and custody of the thirteen-year-old son to the father. While noting its general policy of discouraging the separation of siblings, the Court was satisfied that "the decree we approve today makes elaborate provision for assuring that [the children] are together as much as is reasonably practicable given their residence in separate communities and their attendance at different schools." **Bell**, 572 So. 2d at 846. Likewise, the chancellor in the case *sub judice* awarded to each parent visitation rights such that Jason and Jeremy would be together during weekends, summers and holidays. Furthermore, the chancellor noted that both boys would be attending the same school in Raleigh.

¶30. Before making his custody determination, the chancellor carefully considered the factors set forth by this Court, and made extensive findings of fact regarding those factors. He found that both parents were equally suitable to provide care and a stable home environment for the children, but determined that due to other factors, it was in the best interest of each child to be placed in the custody of a different parent. The chancellor also provided for the children to be together as much as is reasonably practicable in addition to their time together at school. We find that the chancellor did not manifestly err in awarding custody of Jeremy to David Bowen.

### III.

**WHETHER THE CHANCELLOR ERRED IN AWARDING TO DAVID BOWEN USE AND POSSESSION OF THE MARITAL HOME.**

¶31. The chancellor found that each party owned an undivided one-half interest in the marital home and ordered David Bowen to pay the outstanding notes, taxes, insurance premiums and maintenance costs for the home. He awarded to David Bowen the exclusive use and possession of the home until such time as he might abandon the home, or until such time as Jeremy becomes emancipated, at which time the home shall be sold.

¶32. Linda Bowen argues that the chancellor erred in awarding use and possession of the home to David in order to punish Linda. The chancellor stated that his primary reason for awarding use and possession of the home to David "is that I believe that Linda could have, as has been so often testified in this case, saved this marriage. I think to award her the use and possession of the home or for her and Jason really would be to reward her for a situation that she could have remedied, but chose not to." Linda cites the case of *Lenoir v. Lenoir*, 611 So. 2d 200, 204 (Miss. 1992), in which the chancellor had denied the wife's request for a partition of the marital home, the use and possession of which the chancellor awarded to the husband. In reversing the chancery court ruling, this Court stated, "Aside from sheer punishment, there is no compelling reason not to partition [the marital home]. This Court is moving away from the harsh effects of punishment in domestic cases towards the just principles of fairness." *Lenoir*, 611 So. 2d at 204.

¶33. *Lenoir*, being a divorce case, is distinguishable from the case *sub judice*. Linda did not request a partition of the home, but rather sought its exclusive use and possession. Moreover, the parties in *Lenoir* had already raised their children to emancipation, so there were no considerations as to the support and maintenance of children. Whereas in *Lenoir* there truly was no reason other than punishment not to partition the property, in the case *sub judice* there were concerns for the welfare of the couple's children, custody of the youngest of whom was awarded to David.

¶34. In domestic relations cases, the chancellor has "the paramount authority and responsibility . . . to make such orders as are necessary and appropriate for 'the care, custody and maintenance of the children of the marriage.'" *Regan v. Regan*, 507 So. 2d 54, 57 (Miss. 1987) (quoting Miss. Code Ann. § 93-5-23 (1972)). It is well settled that there is no reason why a chancellor, under the broad discretion granted him, cannot award possession of the marital residence, in a divorce or separate maintenance action, to either party. *Lenoir*, 611 So. 2d at 203; *Boykin v. Boykin*, 445 So. 2d 538, 538-39 (Miss. 1984). On appeal, this Court will not overturn the chancery court unless its findings were manifestly wrong. *Lenoir*, 611 So. 2d at 203; *Nichols v. Tedder*, 547 So. 2d 766, 781 (Miss. 1989).

¶35. Although the chancellor in the instant case admittedly considered Linda's responsibility for the couple's marital problems as a factor in his decision to award David the use and possession of the home, we must assume his decision was influenced as well by concerns for the welfare of Jeremy, a consideration which the chancellor was required to make. Although this Court may be able to imagine a more equitable ruling by the chancellor, such as an award of the use and possession of the home to Linda, we believe that, quoting *Chamblee v. Chamblee*, 637 So. 2d 850, 863 (Miss. 1994), "[n]evertheless, the fact that he did not structure the award in this way does not make his ruling rise to the level of manifest error." To quote another case, "The chancellor heard all the testimony, viewed the situation as only a trial judge can, and we are unable to say he was manifestly wrong under the facts of this particular case." *Boykin*, 445 So. 2d at 539 (affirming award to wife of use and possession of marital home even though husband was awarded custody of minor child). Because punishment was not the only consideration in determining the use and possession of the marital home, as it was in *Lenoir*, we find that the chancellor did not err in awarding use and possession of the marital home to David. The chancellor acted prematurely, however, in ordering the partition by sale of the home upon the occurrence of certain events.

¶36. Chancellors have no authority, incident to separate maintenance orders, to order the partition of

real property in the absence of a petition for such. The adjudication of Linda's right to a partition of the home must wait until she prays for such either in a partition suit or in divorce proceedings. Accordingly, we reverse and render on this issue with instructions that the contingent order of the partition of the home be deleted from the chancellor's judgment.

## IV.

### WHETHER THE CHANCELLOR ERRED IN DENYING LINDA BOWEN ANY PORTION OF DAVID BOWEN'S RETIREMENT BENEFITS, OR IN MAKING AN EQUITABLE DIVISION OF MARITAL PROPERTY IN THE ABSENCE OF A DIVORCE.

¶37. The chancellor ordered an equitable division of the marital property, awarding to Linda Bowen ownership of two of the couple's three four-wheeled all terrain vehicles, one-half of the contents of the marital home, and the 1991 Ford Tempo vehicle titled in David's name, with David to pay the outstanding balance owed thereon. The chancellor denied Linda any portion of David's retirement benefits, finding that to do so would be inequitable given that Linda made no direct contribution thereto and in light of the division of other marital property.

¶38. Linda argues that it was error for the chancellor to order a division of marital assets in the absence of a divorce. She cites as authority the case of *Daigle v. Daigle*, 626 So. 2d 140, 146 (Miss. 1993), in which this Court reversed the chancery court's divestiture of the husband's title to real property and a profit-sharing fund where there was no dissolution of the marriage. Linda contends that in the event that she and David do someday get a divorce, David will then raise *res judicata* to prevent Linda from claiming an equitable interest in his retirement benefits. She asserts that should this Court reverse and render on the issue of divorce, she is entitled to an equitable division of the retirement funds.

¶39. In *Daigle*, the Court discussed this very issue as follows:

> As stated above, the objective of separate maintenance is to compel the husband to return to the marital home or to pay for her separate maintenance. The wife's entitlement to separate maintenance is for a monetary amount and does not extend to the division of marital assets. Therefore, the chancery court is not authorized to divest title to real estate from the husband and invest title in the wife. *Thompson v. Thompson*, 527 So. 2d 617, 622-623 (Miss. 1988) (citing *Jones v. Jones*, 234 Miss. 461, 106 So. 2d 134 (1958)). *Thompson* set forth the general principles on this matter:

> Nor should the [separate maintenance] decree award to the wife any part of the husband's estate in fee, except as such as may be consumable in its use and necessary for her reasonable support. The legal duty of the husband to support his wife does not require that he convey any property to her. During cohabitation the wife has the legal right to live in the husband's home, but he is under no legal duty to convey it to her. And after separation her legal rights are no greater than before . . . the court should not, under the guise of enforcing that contractual duty, deprive him of his lands or other specific property, where not necessary for the enforcement of that duty . . . .

***Thompson***, 527 So. 2d at 622 (quoting Amis, ***Divorce and Separation in Mississippi*** (1st ed. 1935)).

As Eddie had conveyed certain income-producing properties to Shannon on his own, and had the means to continue to support Shannon and Kevin in the lifestyle to which they were accustomed prior to the separation, it was error for the chancellor to divest Eddie of title to the real property and to his profit-sharing funds. As this equitable remedy is not a dissolution of a marriage and dividing of marital assets, it was error for the chancellor to divest Eddie of title to the real property, and to the profit-sharing funds.

626 So. 2d at 146.

¶40. In the case *sub judice*, the chancellor did not divest title to any real property from David and vest it in Linda. The marital home, an undivided one-half interest in which the chancellor found Linda owned, was already titled in the names of both parties. As for the awards to Linda of the four-wheelers, one-half of the contents of the marital home and the 1991 Ford Tempo, we cannot say these items were not "consumable in its use and necessary for her reasonable support," and thus the chancellor had authority to make such awards incident to his separate maintenance order. However, under the clear holding of ***Daigle***, the chancellor had no authority to divest David of title to any portion of his retirement benefits. We therefore hold, without determining on the merits whether Linda would be entitled to any part of David's retirement benefits incident to a divorce, that the chancellor did not err in denying Linda such an award in the instant case.

¶41. As to the question of *res judicata* raised by Linda, it is true that a separate maintenance decree is *res judicata* in a subsequent divorce suit so far as concerns any issue which was litigated between the parties in the separate maintenance suit. ***Van Norman v. Van Norman***, 205 Miss. 114, 119-20, 38 So. 2d 452, 454 (1949). However, we are affirming on this issue not on its merits, but rather on procedural grounds, i.e., the chancellor had no authority incident to a separate maintenance order to equitably divide David's retirement benefits. When a lower court denial of a claim is affirmed by this Court on procedural grounds rather than on its merits, such ruling does not bar as *res judicata* any relitigation of the claim. ***Ford v. Commercial Securities Company, Inc.***, 223 Miss. 736, 745, 79 So. 2d 253, 256, *suggestion of error overruled,* 223 Miss. 736, 80 So. 2d 12 (1955). If and when Linda and David are granted a divorce, the chancellor will then have the authority to consider on the merits whether Linda is entitled to any portion of David's retirement benefits.

**V.**

**WHETHER THE CHANCELLOR ERRED IN DENYING LINDA BOWEN AN AWARD OF $2,500 IN STIPULATED ATTORNEY FEES.**

¶42. Linda and David stipulated that $2,500 was a reasonable attorney fee for each party in this case. David points out that although he stipulated the amount of each party's fees, he never agreed to pay Linda's fees. Linda testified that she had no separate estate with which to pay her fees, and that she had to borrow the money from her father. In ruling on this issue, the chancellor stated:

As far as attorneys fees are concerned, the Court is not going to award either party any

attorneys fees. The Court believes that each party can pay their attorneys. The mere fact that Linda had to borrow money to pay her attorney is not indicative that she is unable to pay an attorneys fee. What impresses the Court here is that the testimony is uncontradicted that for the last six months of [1993] she earned $10,480. So I believe she can pay her attorneys fee.

Linda contends that the chancellor erred in his ruling "since attorneys' fees are allowed a spouse with no separate estate," for which she cites no authority.

¶43. Aside from Linda's lack of supporting authority on this issue, the award of attorney fees in a divorce case is generally left to the discretion of the chancellor. *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994); *Adams v. Adams*, 591 So. 2d 431, 435 (Miss. 1991). "We are reluctant to disturb a chancellor's discretionary determination whether or not to award attorney fees and of the amount of [any] award." *Ferguson v. Ferguson*, 639 So. 2d 921, 937 (Miss. 1994) (quoting *Geiger v. Geiger*, 530 So. 2d 185, 187 (Miss. 1988)). A chancellor does not abuse his discretion in denying attorney fees to a party who is financially able to pay such fees. *Cheatham v. Cheatham*, 537 So. 2d 435, 440 (Miss. 1988). We cannot say the chancellor was manifestly wrong in finding that Linda was able to pay her attorney fees, so the chancellor did not abuse his discretion in denying her such an award.

## CONCLUSION

¶44. We find no error committed by the chancellor in this case save his order of the partition by sale of the marital home upon the occurrence of certain events. We reverse and render on this issue with instructions that this part of the chancellor's judgment be deleted. In affirming the rest of the chancellor's judgment, we expressly reserve Linda's right to claim an equitable interest in David's retirement benefits in the event of a divorce.

¶45. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS AND SMITH, JJ., CONCUR. McRAE, J., CONCURS IN RESULTS ONLY.**

1. This occurred after David and Linda had separated.